## CITY OF FORT LAUDERDALE v. STEVENS.
### No. L-66-186.
Circuit Court, Broward County, Criminal Appeal.

August 29, 1966.

Robert J. Davis, Fort Lauderdale, for appellant.

Joel K. Gustafson, Fort Lauderdale, for appellee.

RICHARD M. SAULS, Circuit Judge.

The appellant, Roderick G. Stevens, Jr., brings his appeal from three convictions in the municipal court of the city of Fort Lauderdale, finding him guilty of violating sections 28.2, 28.15 and 28.45 of the code of ordinances of said city, and assessing fines totaling $600 and confinement in the city jail for a total of 105 days.

In order for this court to discuss the legal problem assigned for consideration, it is necessary to recite the sections of the code of ordinances involved, or the portions thereof material to the problem here —

Sec. 28-2. *Assault and battery.*

Whoever commits an assault and battery on another person, or assaults another person, within the corporate limits of the city shall be punished as provided for in section 1-6 of this Code.

Sec. 28-15. *Disorderly conduct.*

All persons who shall make, aid, countenance or assist in making improper noise, riot, disturbance, breach of the peace or diversion tending to a breach of the peace, within the limits of the city; all persons who shall collect in bodies or crowds for unlawful purposes, or for any purpose, to the annoyance or disturbance of other persons; all persons who

are idle or dissolute and go about begging; all persons who use or exercise any juggling or other unlawful games or plays; all persons lodging in or found at any time, in sheds, barns, stables or unoccupied buildings, or underneath sidewalks, or lodging in the open air and not giving a good account of themselves; all persons who are found in houses of ill-fame or gaming houses; all persons who shall wilfully assault another in the city, or be engaged in or aid or abet any fight, quarrel or other disturbance in the city; all persons who stand, loiter or stroll about in any place in the city waiting or seeking to obtain money or other valuable things from others by trick or fraud or to aid or assist therein; all persons who shall engage in any fraudulent scheme, device or tricks to obtain money or other valuable thing in any place in the city, or who shall aid or abet or in any manner be concerned therein; all touts, ropers, steerers, or cappers, so called, for any gambling room or house who shall ply or attempt to ply their calling on any hotel block, barroom, gambling house or disorderly house, or wandering about the streets either by night or by day without any known lawful means of support, or without being able to give a satisfactory account of themselves; all persons who shall have or carry any pistol, knife, dirk, knuckles, slingshot, or other dangerous weapon concealed on or about their persons; and all persons who are known to be thieves, burglars, pickpockets, robbers or confidence men, either by their own confession or otherwise, or by having been convicted of larceny, burglary, or other crime against the laws of the state or any state in the United States, who are found lounging in or prowling or loitering around any steamboat landing, railroad, depot, banking institution, place of public amusement, auction room, hotel, store, shop, thoroughfare, car, omnibus, public conveyance, public gathering, public assembly, court room, public buildings, private dwelling-house, out-house, house of ill-fame, gambling house, tippling shop, or any public place, and who are unable to give a reasonable excuse for being so found, shall be deemed guilty of disorderly conduct.

Sec. 28-45. *Resisting arrests or service of process; refusing to aid police.*

It shall be unlawful for any person to obstruct or resist a police officer of the city in making or attempting to make a lawful arrest or resist any person called upon by an officer to aid in making an arrest or in serving or attempting to serve any legal process, or knowingly to give false or untrue or misleading information about inquiry by an officer of the city regarding the whereabouts or identity of a person for whom an officer shall have a warrant, or in performing or attempting to perform his official duty, whether such person be acting as principal or accessory.

The circuit court, sitting as an appeal court, is charged with a specific statutory duty, when reviewing municipal court appeals. Section 932.52 (13), F. S. A., provides —

"(13) The circuit court, on appeals under this section, shall examine the record and reverse or affirm the judgment appealed from, giving such judgment or order as the trial

court should have given or otherwise as it may appear according to law. The circuit court shall have power to lower the sentence imposed by the municipal court if in his discretion the same should be lowered."

The appellant has assigned twelve grounds for his appeal, and argues six questions in his brief; however, the Florida Supreme Court, speaking of the appellate court's duty, when reviewing an appeal from a municipal court under section 932.52 (13) has said —

"It is the duty of the circuit court in reviewing judgment of municipal court, to determine whether the municipal court had before it competent substantial findings and judgment." F. S. A., section 932.52 (13). Cohen v. State, 99 So. 2d 563.

Thus, this court, with its duty established by statute and directed by our superior court, must examine the entire record in this cause, and if justice demands, ignore the assignments of error and arguments advanced by either the appellant or the city and render its decision independently, based upon the record as an entirety.

A distillation of the facts leading up to the charges upon which the appellant was arrested, tried and convicted, discloses —

Sam Harris, the owner and operator of the Sea Horse restaurant, located on Las Olas Boulevard in Fort Lauderdale, called Sergeant Sherlock of the city police department, and asked for two officers for special assignment to his place of business as "protection". (There was public-sponsored activity being conducted in the public street in the area where the Sea Horse restaurant is located, and the sidewalks and other public ways were very crowded on the night of November 19, 1965, the date when the alleged "offenses" were committed by the appellant.) (Tr. 32)

Police officers Bruce and Francis were sent to the restaurant. These officers were paid by the owner of the restaurant, and were working for him and not the city at all times material to the issues under consideration. (Tr. 44)

Officer Bruce was stationed near the entrance to the Sea Horse on the public sidewalk, and had been instructed generally by Mr. Harris as follows — ". . . Being such an unusual night, it was more people than hardly we could handle. And their instructions was not to let any minors — to the effect we handle

beverages — anyone of such people who may get unruly, or not properly dressed. That was my instructions to the officers." (Tr. 32) The officer was never given any specific instructions by Mr. Harris as to exactly what was intended to be described by "not properly dressed." (Tr. 41, 42)

The appellant and some other companions arrived at the Sea Horse, on the public sidewalk, and attempted to enter when he was advised by Officer Bruce he could not enter because he was improperly dressed. (Tr. 66, etc.)

(Further detailing of testimony of other witnesses as to this phase of the case is not essential to the court's final determination and will not be discussed, except for Officer Bruce's dialogue.)

The transcript, pages 65 and 66, discloses Officer Bruce's dialogue in response to questions by the city's prosecutor —

The Witness: I was pulling a detail at the Sea Horse restaurant on East Las Olas and 9th Avenue.

Were you in uniform? — Yes, sir, I was. I was instructed to stand by this door, right here (indicating).

The Court: Indicating the east door.

The Witness: Yes, sir. The east door, which is double doors. I was to keep certain people from coming into the restaurant; people that were intoxicated, people that wasn't properly dressed, teenagers that were coming in just to use the restrooms. Also instructed to keep people from bringing glasses outside the restaurant.

Who instructed you? — Sam Harris. He is the owner of the Sea Horse restaurant.

I see. All right. What happened then? — Well, I was standing at this door keeping the traffic clear. * * * Well, as they approached and started into the door, I stopped them and I told them that they wasn't allowed to come in. And Mr. Stevens wanted to know why.

Mr. who? — Roderick Stevens. Excuse me, Mr. Stevens, Jr. He said he wanted to know why. * * * I explained to him, because his attire wasn't appropriate and that the manager instructed me to not let anybody in, who wasn't in a proper attire. They moved on down the sidewalk. They tried — or they entered this door right here. This is also double doors. As they entered . . .

The Court: Let the record reflect . . .

The Witness: To the west corner of the building . . .

The Court: The witness is indicating the west double doors.

The Witness: Yes, sir. As they entered, I went through the east door, through the lobby here, I intercepted them just as they were coming in the door, approximately, here. I stopped them.

The Court: Now, let's get this for the record. You are saying that you intercepted them at what point; just inside the *west* door?

The Witness: Yes, sir. The door was still opened as they were coming in. I stopped them and I explained to him that I told them, that they wasn't allowed to come in. And I asked them if they would please leave. So, Mr. Stevens wanted — insisted he wanted to see the manager. I explained to him that the manager was busy, and he couldn't see him at this time. They walked back out on the sidewalk and the rest of the group stayed in this vicinity. Right here.

The Court: Indicating the vicinity of the sidewalk immediately in front of the west double doors.

The Witness: I walked back down to where I was standing in front of the east door. Mr. Stevens told me, standing in front of me, demanding that he wanted to see the manager. I explained to him again, that it was impossible; that the manager was busy and he gave me instructions not to let certain people in. * * * So, when they moved on down the sidewalk, I again asked Mr. Stevens to leave. He refused. He said he wanted to see the manager. I took him by the arm, or by the elbow, rather, walked him to the side of the sidewalk, as he was blocking traffic. And I told him to leave and not to come back.

(By Mr. Gustafson) He was blocking traffic where? — On the sidewalk, and also in front of these doors. I told him to leave and not to come back. Mr. Stevens then approached the group of fellows who were still waiting for him, that were in front of the west door. As he approached one, he took a can of beer from one of them and turned, and looked at me, and he turned it up and drank it down. After he handed the beer back to him, he turned and looked at me again. I paid no heed to him, and about this time I was approached by Officer Francis. He got word down the way that . . . * * * I did not see Mr. Stevens at this time, for several minutes. And when Officer Francis returned, he asked me if I knew that these fellows was in the restaurant. And I told him, I didn't. He stated that they were in the lobby. I entered the door — the east doors — I walked through the lobby and I seen Mr. Stevens and Mr. Nevin standing in front of a pillar, in the restaurant — a concrete pillar — leaning — Mr. Stevens was leaning up against it, looking around. Nevin was to his left, standing. I walked up and I took a hold of Mr. Stevens' arm, and when I did this, his watchband broke and it fell on the floor. I picked it up and I handed it to him, and I said, "I told you not to come in the restaurant, and you are going to have to leave." And he stated to me that he was not leaving. And I told him I didn't want any trouble in the lobby. He stated to me that he had a table coming and he was waiting for it. I told him he was not staying in the restaurant; and I told him to leave and he was leaving. I took him by the arm — elbow — he jerked loose from my hand. As I reached for it, he hit me up side the left cheek with his fist and that's when the melee started.

The testimony of the appellant is not materially different from that of the police officer, as it relates to the incident, outside the restaurant. (Tr. 193, 194) He did state that he requested to see the manager and the officer refused to honor this request.

The appellant, a few moments after being refused admission by the officer, gained admission to the restaurant by another way, and asked the hostess inside if he were permitted to enter. (Tr. 195, 93, 94)

It seems that two employees of the Sea Horse had issued conflicting invitations to the appellant — one an invitation to "stay out", and the other to "stay in".

Thus, the stage was set for the multiplicity of charges that were lodged against the appellant by the municipal police.

Although the appellant did not directly raise the legality of his arrest in the trial court, the record discloses, under the circumstances developed by the testimony of Officer Bruce and others, that the initial arrest was highly irregular and, we find, illegal.

We find that the power or authority of a municipal police officer to make an arrest is set out in McQuillan, Municipal Corporations, vol .16, sec. 45.15, at page 671 —

"The powers and duties of police officers are sometimes defined by statute and, where such is the case, greater or inconsistent powers may not be conferred by ordinance. In the absence of a showing with respect to their powers, policemen are presumed to possess the ordinary powers of peace officers at common law. . . ."

and section 45.18, at page 677, McQuillan, supra, it is further stated —

". . . However, unless the rule is changed by statute, a police officer has no right to arrest without a warrant in case of a misdemeanor, when the crime was not committed or attempted in his presence."

Section 132 of the charter of the city of Fort Lauderdale, among other things, provides that a police officer shall have the power and duty to make an arrest without a warrant under the following circumstances —

Sec. 132. *Powers of Police Officers.*

All processes, warrants, and other papers, issued by the Municipal Court or the Judge thereof, shall be served by the Chief of Police of City of Fort Lauderdale or any duly qualified police officer; and it is hereby made the duty of the members of the Police Department of City of Fort Lauderdale to serve any and all writs and processes issued out of said Municipal Court or by said Municipal Judge, and to make proper returns upon the same to such Court, in the same manner as is required of constables and sheriffs in the execution of similar processes and papers.

Police officers shall have the power and duty to make arrests without a warrant, in the following instances:

(a) For all violations of municipal ordinances and state felonies or misdemeanors committed within their presence within the corporate limits of the City, or on real property owned by the city outside the corporate limits;

(b) For violations of municipal ordinances and state misdemeanors and felonies not committed in their presence when they have reasonable cause to believe that an Offense has been committed and that the person about to be arrested has committed said Offense within the corporate limits of the City, or on real property owned by the City outside the corporate limits;

(c) Anywhere in Broward County for violations of municipal ordinances or state misdemeanors and felonies committed within the corporate limits when such police officer is in fresh pursuit of the alleged violator from inside the corporate limits to outside said limits.

Section 901.15, F. S. A., permits a peace officer to make an arrest without a warrant as follows —

"(1) When the person to be arrested has committed a felony or misdemeanor or violation of a municipal ordinance in his presence. In case of such arrest for a misdemeanor or violation of a municipal ordinance, the arrest shall be made immediately or on fresh pursuit."

In order for Officer Bruce to have made a lawful arrest of the appellant without a warrant, one or more of the above-described acts must have been done in his presence by the person sought to be arrested.

However, in this instance, the police officer, at the time of the alleged arrest, was in the private employment of Sam Harris, the owner and operator of the Sea Horse restaurant.

The city contends that the officer was acting in a dual capacity at the time of the alleged offense that was committed by the appellant; that is, he was on the private payroll of the restaurant owner, and at the same time, he was performing his official duty as a policeman of the city of Fort Lauderdale. However, the city cites no authority to support this position, and the court has not been able to find any by independent research.

The Supreme Court of this state has said — "The character of the duty performed by a city employee determines his status as an 'officer 'or 'employee'." Curry v. Hammond, 16 So. 2d 523. In that case a city policeman, for the purpose of determining his status under civil service, was determined to be an "officer", and as such, he was "clothed with sovereign power of the city while discharging his duty."

The trial record in this cause fails to disclose any act that had been committed by the appellant up to the time Officer Bruce approached him in the Sea Horse restaurant that would have constituted a misdemeanor under the common law, or a violation of a state statute, or a violation of a city ordinance of the city of Fort Lauderdale.

Officer Bruce, by attempting to remove the appellant from the inside of the Sea Horse restaurant, was merely attempting to enforce a private request or to carry out an instruction given to him by Mr. Harris, and was not attempting to arrest the appellant for committing a misdemeanor or an offense in violation of a state statute, or a city ordinance, in the presence of the officer, and, most certainly, he had not committed a felony, which would have permitted an arrest without a warrant.

The record discloses that the appellant was arrested, tried and found guilty of violating the three ordinances that are mentioned above; however, the transcript discloses that, at least two of the charges are unsupported by the evidence, and the remaining one is highly questionable.

Section 28.45 of the city charter, under which the appellant was found guilty of resisting arrest specifies — "It shall be unlawful for any person to obstruct or resist a *police officer of the city in making or attempting to make a lawful arrest . . ."* (Italics added.)

As mentioned, when Officer Bruce attempted to escort the appellant from the inside of the restaurant, he was not placed under arrest, lawfully or otherwise, but, on the contrary, Officer Bruce stated —

> . . . After I got the handcuffs on Mr. Stevens, I noted that he had a bad cut on his left arm, which was an open laceration, which I found out later that it was — stitches had been pulled loose. I tried to administer first-aid there.
>
> (By Mr. Gustafson) Right on the premises, did this happen? — Yes, sir. I wrapped a handkerchief around it.
>
> What was he doing at the time? — Well, at that time he was letting me wrap a handkerchief around it. *And I told him that he was under arrest.* And I picked him up. And on the way out through the restaurant, he started struggling. (Italics added.)
>
> Where was his hands at this time? — They were handcuffed behind his back.
>
> Where were you? — I was behind him.

Now, how did he struggle? Do you want to be more — Tell us what he did when you say, "struggling"? — When I took him with my right hand by his left elbow, to assist him through the back of the restaurant, because it was too crowded to try to go out the front way, he kept jerking, twisting around, trying to jerk my hand loose from him. Finally, I got him out through the restaurant into the back where a unit was called and he was transported to the station.

A peace officer, city, county or state, when making an arrest, has a duty, which we find outlined in Florida Jurisprudence —

"Generally speaking, an officer in making an arrest for an offense not committed in his presence should make known his purpose, the official capacity in which he is acting, and the cause of the arrest, if opportunity is given to do so. This principle is embodied in the Florida statutes which provide that an officer in making an arrest, either with a warrant or without a warrant, must inform the person to be arrested of the cause of his arrest and of the fact that the warrant has been issued for his arrest, except when the person sought to be arrested flees or forcibly resists before the officer has had an opportunity so to inform him, or when the giving of such information will imperil the arrest.

"While there is considerable authority for the view that an officer making an arrest under warrant should, if requested, show his warrant, under the Florida statutes, while the officer need not have the warrant in his possession at the time of the arrest, if the person arrested so requests after the arrest, the warrant must be shown to him as soon as practicable." (Vol. 3, section 32, page 69, paragraph 1.)

Officer Bruce failed to do this, and under our law, a person has a right to resist an unlawful arrest.

It has been said — "When a deputy sheriff attempts to arrest a party without a warrant, arrested party may use reasonable force proportionate to injury attempted to effect his escape, but he is not permitted to use more. . . ." (Alday v. State, 57 So. 2d 333.) The court in that case also said — "Some cases hold that an arrest without a warrant amounts to a trespass and affords the person arrested such provocation to resist that if murder is committed in doing so it will be reduced to manslaughter."

Officer Bruce's testimony demonstrates that he attempted to remove the appellant from the restaurant by taking him by the arm, and without arresting him, and as such, his mere touching the appellant, technically, constituted an assault, and the party had a right to use force to resist the trespass to his person. The

right of self-defense extends to an unlawful act by a police officer against a citizen.

The police officer was without authority to arrest the appellant for his entering the Sea Horse restaurant merely because the officer had been instructed by the owner not to allow certain persons to enter, and had so advised the appellant, without a warrant being issued.

The disorderly conduct charge lodged against the appellant could, under a gross application of the facts here, stand; however, this court is of the opinion that under the facts and circumstances, as disclosed by the transcript, the disorderly activities of the appellant were brought about by the unauthorized conduct of the city's police officer in the first instance, while in the employment of a private citizen, and who was not discharging his "official" duties, although dressed in his police uniform at the time, and carrying out private instructions of a citizen.

By way of observation, the record discloses that the police officer and the appellant had exchanged some unpleasantries a few weeks before and at that time the appellant might have provoked the animosity of the police officer by directing a personal insult toward him. Words, or facial grimaces, do not constitute an assault and are not justification for an assault on the speaker or actor.

A police officer is not devoid of human emotions, and this court is well aware of the verbal abuse he must suffer at the hands of the citizenry; however, he takes an oath to uphold the law, and he must discharge this duty, no matter how gross the insult, if it does not violate a public law.

> "A judgment that has no competent substantial evidence to support it cannot stand and affirmance of such judgment is such a departure from the essential requirements of law as to require the Supreme Court, in the exercise of its power, to issue common law writ of certiorari, to quash order of affirmance." Cohn v. State (Fla.), 99 So. 2d 563.

This court is aware of the law enforcement problems of the local police and can appreciate the trial judge's conclusion that resulted in the instant review; however, until the law is changed, the arrests and the resulting judgment and sentences of the appellant, must be reversed. Accordingly, it is ordered and adjudged that each of the judgments and sentences that are the subject matter of this appeal are hereby reversed and set aside.